

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BRADFORD VERNON BLAKEWAY, | § | No. 08-23-00280-CR |
| | § | |
| Appellant, | § | Appeal from the |
| | § | 394th Judicial District Court |
| v. | § | of Jeff Davis County, Texas |
| THE STATE OF TEXAS, | § | (TC# CR2300921) |
| | § | |
| Appellee. | § | |

## MEMORANDUM OPINION

Appellant Bradford Vernon Blakeway was indicted by a grand jury on four separate offenses stemming from an event that occurred on February 20, 2023, in which Appellant allegedly threatened, assaulted, and kidnapped Jeff Fisher in retaliation for Fisher testifying against him in a prior court proceeding. A jury found Appellant guilty of one count of first-degree aggravated assault by threat and one count of aggravated assault by causing bodily injury, both with the use of a deadly weapon and both in retaliation against Fisher for his service as a witness; one count of aggravated kidnapping with the use of a deadly weapon; and one count of retaliation for

1

threatening Fisher due to his prior service as a witness.[1] In this appeal, which is from the conviction for the retaliation offense, Appellant contends retaliation, as pled in the indictment, was a lesser-included offense of aggravated assault by threat, and double jeopardy bars his convictions for both offenses. For the reasons set forth below, we agree and reverse his conviction for the retaliation offense.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Events prior to the offense

The victim, Jeff Fisher, testified at trial as follows. He and Appellant had been friends and neighbors since 2007, living in a rural area approximately 20 minutes from Fort Davis, Texas called the Davis Mountain Resort (the DMR). Fisher and his wife assisted Appellant when he suffered two strokes—one in 2018, and a second in late 2019 or early 2020. Fisher often bought groceries and ran errands for Appellant, as Appellant had difficulty driving due to his vision issues.

After his second stroke, law enforcement forced Appellant to go to the hospital in an ambulance. Thereafter, Appellant, who was never a "fan" of law enforcement, and believing they had no right to enter the DMR, told Fisher he was "frustrated" and "disgruntled" with law enforcement and believed they were "trying to kill him." In Fisher's presence, over the course of several days, Appellant began to "make threats to the legal community and the . . . people in the courthouse," and began voicing an intent to go to the courthouse and "shoot lawmen." On one occasion, Appellant told Fisher that he was "liable to wake up one morning . . . and go down to

---

[1] The grand jury issued separate indictments for each of the four offenses, but the trial court consolidated them for purposes of trial. Appellant has filed separate notices of appeal for each of his convictions. We address the other three appeals in separate opinions that we issue this day in Cause Numbers 08-230-00277-CR, 08-23-00278-CR, and 08-23-00279-CR.

the courthouse, kill civilians, and then kill all men and keep killing." Fisher believed he was the only person to whom Appellant voiced his threats.

Taking the threats seriously, Fisher reported them to the authorities. Appellant was later charged with making a terroristic threat. He was in jail for approximately 18 months awaiting trial.[2] In December 2021, at Appellant's jury trial, Fisher was the State's main witness. There, Fisher testified that he heard Appellant threaten to "shoot people at the courthouse" and "go down to the courthouse and kill lawmen." The trial resulted in a hung jury. The State thereafter filed a motion to dismiss the charge, as it had not discovered additional evidence that would "change the outcome of a second trial." The trial court granted the motion on February 22, 2022.

Several months later, on November 30, 2022, Appellant appeared at the office of William Ghormley, II, the elected treasurer for the DMR corporation, who recalled Appellant asking his office to inform all residents that no law enforcement officer was allowed in the DMR. When Ghormley informed him that he would need a court order to prevent anyone from entering the DMR, Appellant responded that he did not need one from "those evil people." Ghormley recalled Appellant specifically referring to the county sheriff and his deputies, a specific Texas Department of Public Safety officer, and Judge Ferguson[3], contending "they were lying evil people and that he didn't need their help or their permission." Ghormley also recalled Appellant saying that Fisher was "an evil, lying, deceitful, man and that he was going to get him," which Ghormley interpreted to mean Appellant intended to do "bodily harm" to Fisher. Ghormley reported the matter to the

---

[2] The record reflects that prior to his 2021 trial, an expert found Appellant incompetent to stand trial, but the jury disagreed and found him competent.

[3] Judge Ferguson is the presiding judge of the 394th Judicial District Court in Jeff Davis County in which Appellant's trial for terroristic threat was held.

sheriff's office and, that same afternoon, provided a written statement, which was introduced in evidence at the current trial.

### B. The events of February 20, 2023

#### (1) The assault on Fisher

According to Fisher, he had no contact with Appellant between the time the trial court dismissed the terroristic threat charge and February 20, 2023, when he encountered him in the DMR "campground" area. Fisher, who does "well service[s]" in the area, explained that he leased a space at the campground where he kept storage containers for his business equipment and tools. He recalled that he was moving some equipment from his truck into the storage containers at approximately 9:30 a.m. that day, when he observed Appellant's parked vehicle approximately 200 feet away by the "washateria."

Appellant began walking toward Fisher at a "brisk pace," and as he got closer, Fisher saw that Appellant was holding a gun. Appellant told Fisher, who was standing on his truck at the time, to get down from the "goddamn truck, you motherfucker, or I'm going to blow your fucking head off." After Fisher complied, Appellant pointed the gun at him and told him to raise his hands, saying he had a "warrant for [his] arrest" and was "making a citizen's arrest." Fisher testified that Appellant then ordered him, at gunpoint, to put his hands up and walk over to the storage containers approximately 12 to 15 feet away, while continuing to threaten him. Appellant told Fisher to put his hands on the containers then "frisked" him for weapons. Appellant directed Fisher to clasp his hands on his head and walk over to Appellant's truck. As he walked, Appellant continued to threaten to "blow [Fisher's] fucking head off" if he tried to turn or move away from him.

Upon reaching Appellant's truck, Appellant directed Fisher to walk to the passenger side and put his hands on the hood. Fisher recalled Appellant standing behind him saying Fisher had

4

"ruined [his] life," stolen gasoline from the reserve tanks on Appellant's property, and stolen money from him—apparently referring to occasions on which Appellant had given him money to buy groceries and supplies for him, all of which Fisher denied.[4] Appellant repeated that he had a "warrant for [Fisher's] arrest" but that he would release Fisher if he would "go tell the Judge that [he] lied about [Appellant] wanting to go down to the courthouse and burn it down." Fisher responded that he did not say that to the judge. When Appellant asked him what he did say, Fisher replied that he "told them" he had heard Appellant say he was "going to go into the courthouse and shoot lawmen" and "kill lawmen." Fisher recalled the conversation ending at that point. When asked if he believed Appellant was "angry" with him for reporting the threats, Fisher testified that Appellant did not express that he was, but Fisher acknowledged that Appellant may have been angry with him over being in jail while awaiting trial on the terroristic threat charge resulting from Fisher's report.

Fisher recalled that after their conversation ended, Appellant began backing away while keeping the gun pointed at him and telling him to "stay still" or he would "blow [his] fucking head off." Appellant then took an ax handle from his truck and came toward Fisher. Holding both the gun and the axe handle, he told Fisher he was going to "teach" him something. Fearing Appellant was going to harm him, Fisher "broke and went into him." A struggle ensued, during which Appellant hit Fisher on his left arm with the axe handle. As Appellant was hitting him, Fisher grabbed the axe handle and hit Appellant over the head with it four or five times in an attempt to incapacitate Appellant and "defend [his] life." Fisher continued to hit Appellant on his head, shoulder, and back with the axe handle until the gun flew out of Appellant's hand. He then hit

---

[4] According to Fisher, Appellant had never accused him of stealing prior to this event. Fisher testified that he had receipts for all the purchases he made for Appellant.

Appellant one final time to prevent him from retrieving the gun. After unsuccessfully trying to calm Appellant down, Fisher fired three shots in the air as a call for help, after which Appellant told him "I'm done."

### (2) Events following the assault

Fisher tried to "herd" Appellant to an area where his cell phone had service so he could call 911, but Appellant continued to threaten him. Fisher then "bolted" and drove off in his truck to Joy Bates's house. Bates, Fisher's neighbor, testified at trial that when Fisher arrived, he had a gun and an axe handle, and appeared "scared" and was "shaking." Fisher told her Appellant had assaulted him. Bates recalled that although Fisher did not appear injured, he had blood on his clothes, which Fisher told her came from Appellant's head after Fisher hit him with the axe handle. According to Bates, Fisher attempted to call 911 from her house but was unable to due to poor cell phone service. Fisher then walked across the street where she believed he was able to call 911.

Fisher confirmed that he was able to call 911 from another neighbor's house to report that he had been assaulted by Appellant. The 911 operator testified that Fisher, sounding "frantic," reported that Appellant had assaulted him but that he had been able to take Appellant's gun and hit Appellant with it.

Chief Deputy Jeff Walker of the Jeff Davis County Sheriff's Office and Officer Victor Lopez of the Marfa Police Department were dispatched to the scene of the incident. The officers testified that when they arrived, Fisher pulled up in his vehicle at a high rate of speed and jumped out with a gun and an axe handle in his hands, appearing to be scared and upset. Fisher informed the officers that Appellant had approached him earlier that morning, threatened him at gunpoint, and taken an axe handle from his vehicle. Fisher described the struggle that ensued, during which he was able to take the gun and axe handle from Appellant, acknowledging that he hit Appellant's

6

head with the axe handle in response to Appellant's threats.

The officers did not recall seeing any blood on Fisher, but they both observed blood on the axe handle, which Fisher acknowledged came from Appellant's head when he hit Appellant. The officers recalled that Fisher appeared uninjured, but for bruising on his left arm. Deputy Walker took two photographs of Fisher's left arm that day, which were admitted in evidence at trial. Fisher's wife also took photographs of the bruising on his arm two or three days later, which Fisher provided to the sheriff's office and were also admitted in evidence. Fisher acknowledged that he did not seek medical treatment for the injuries to his arm but averred that his arm "hurt."

Officer Lopez recalled that approximately 20 minutes after his interview with Fisher, he drove to the Jeff Davis Sheriff's Office, where he encountered Appellant and his neighbor, Daniel Gunn, who was taking Appellant to the hospital. Appellant informed Officer Lopez that Fisher had "hit him in the back of the head with a rock and had kicked him a couple times in the ribs and took his gun away from him." Observing that Appellant was "bleeding pretty bad" from his head and had blood all over him, he did not question Appellant at the time. He believed it was more important that Appellant be taken to the hospital. Still photographs were later obtained from Officer Lopez's body camera, which were introduced in evidence at trial, depicting Appellant sitting in the passenger seat of Gunn's car with his head covered in blood.

At trial, Gunn testified as a defense witness. He stated that he and Appellant generally did not have much contact with each other, even though they had been neighbors for ten or 12 years. However, he recalled that on February 20, 2023, Appellant came to his door covered in blood and appeared to have been beaten. Appellant informed him that Fisher had hit the back of his head with a rock and beat him with an axe handle after taking his gun. Appellant told Gunn that he wanted to call the Texas Department of Public Safety (DPS), rather than the Sheriff's Office, but

Gunn was unable to find a number for DPS.[5] At some point, Appellant asked Gunn to drive him to the hospital. On the way, Gunn stopped in Fort Davis, where they encountered Officer Lopez and spoke with him about the incident before continuing to the hospital. Gunn believed that Appellant spent the night in the hospital although he was not asked to pick him up the next day.

Relevant to this appeal, a grand jury indicted Appellant in April of 2023 on one count of retaliation, alleging that he "intentionally or knowingly threaten[ed] to harm another, namely Jeff Fisher, by an unlawful act, namely threaten to kill him, in retaliation for or on account of the service of Jeff Fisher as a witness."

## C. Appellant's defense and the jury's verdict

At trial, Appellant's attorney argued that Fisher's story was not credible, contending that it made no sense for Appellant, who was much older and weaker than Fisher, to attack him in broad daylight.[6] He argued that Appellant was the true victim in the case, given his medical condition and Fisher's lack of any significant injuries. The State maintained that Fisher was credible, and his story was consistent.

The jury was instructed that it could find Appellant guilty of the offense of retaliation if it found, beyond a reasonable doubt, that Appellant "intentionally or knowingly threatened to kill

---

[5] The same 911 operator who received Fisher's call testified that she also received a call from Officer Lopez, who informed her that Appellant "wanted DPS." However, the operator informed Officer Lopez that DPS would not respond to an incident in a "residential area," and she therefore did not attempt to connect him to DPS.

[6] Prior to trial, two employees from the jail where Appellant was being held, including the nurse, contacted Appellant's attorney about their concerns regarding Appellant's competency. They reported he was suffering from increasing signs of dementia. Appellant's attorney filed a motion for a competency examination, but at a hearing on the motion the month before trial, defense counsel informed the trial court that he did not believe a competency evaluation was necessary, as he believed Appellant was able to communicate effectively with his office, understand the nature of the charges against him, and assist him with trial preparation. Upon agreement of the parties, and finding no basis for finding Appellant incompetent, the trial court denied the motion. However, at the punishment phase of the trial, defense counsel presented the testimony of the same two jail employees, who testified to their concerns.

Jeff Fisher and communicated this threat to Jeff Fisher in person, [that] killing Jeff Fisher would be an unlawful act; and [that Appellant] did this in retaliation for or on account of the service or status of Jeff Fisher as a witness." The jury found Appellant guilty of the third-degree felony offense of retaliation, and the trial court sentenced him to ten years' imprisonment for this offense.[7] This appeal followed.

## II. THE DOUBLE JEOPARDY CLAIM

In his sole issue on appeal, Appellant argues the retaliation offense was a lesser-included offense of the aggravated-assault-by-threat offense, as pled in the indictments filed against him, and that double jeopardy therefore bars his convictions for both offenses. We agree.

### A. Applicable law and standard of review

"The Double Jeopardy Clause of the United States Constitution is applicable to the states through the Fourteenth Amendment, and it protects an accused from impermissible multiple punishments or successive prosecutions for the same offense after an acquittal or conviction." *Ex Parte Castillo*, 469 S.W.3d 165, 168 (Tex. Crim. App. 2015) (citing U.S. Const. amend. V, cl. 2; *see Ex parte Amador*, 326 S.W.3d 202, 205 (Tex. Crim. App. 2010)); *see also Price v. State*, 434 S.W.3d 601, 609 (Tex. Crim. App. 2014) ("The Fifth Amendment guarantee against double jeopardy protects 'against multiple punishments for the same offense.'"). Relevant here, "a multiple punishments double-jeopardy violation occurs if both a greater and a lesser-included offense are alleged and the same conduct is punished once for the greater offense and a second time for [the] lesser." *Ex parte Denton*, 399 S.W.3d 540, 545 (Tex. Crim. App. 2013); *see also Parrish v. State*, 869 S.W.2d 352, 354 (Tex. Crim. App. 1994) (recognizing that "greater inclusive

---

[7] The trial court ordered this sentence to run concurrently with the sentences imposed for his other three convictions in this matter.

and lesser included offenses are the same for jeopardy purposes"). Thus, as this Court has previously recognized, when the "evidence shows that the defendant committed only one act that could be used to prove both a greater inclusive and a lesser included offense, the defendant cannot be convicted of both offenses." *Fowler v. State*, No. 08-11-00027-CR, 2012 WL 983189, at *6–7 (Tex. App.—El Paso Mar. 21, 2012, pet. ref'd) (not designated for publication) (citing *Ochoa v. State*, 982 S.W.2d 904, 908 (Tex. Crim. App. 1998)).

Under Texas Code of Criminal Procedure article 37.09(1), "[a]n offense is a lesser included offense if . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]" *Lang v. State*, 664 S.W.3d 155, 164 (Tex. Crim. App. 2022). Whether an offense is a lesser-included offense of a greater offense is "a question of law, and it does not depend on the evidence . . . produced at trial." *Id.* (citing *Safian v. State*, 543 S.W.3d 216, 220 (Tex. Crim. App. 2018); *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011)). To determine whether a lesser-included offense exists under Article 37.09(1), a court uses the cognate-pleadings approach. *Id.* (citing *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007); *Ex parte Watson*, 306 S.W.3d 259, 273 (Tex. Crim. App. 2009) (op. on reh'g) ("[I]n *Hall* we adopted the cognate pleadings approach exclusively and expressly rejected all other approaches to lesser-included offense determinations[.]"). "Under the cognate-pleadings approach, the reviewing court compares the elements of the greater, charged offense as stated in the indictment to the statutory elements of the purported lesser-included offense." *Id.* (citing *Fraser v. State*, 583 S.W.3d 564, 568 (Tex. Crim. App. 2019); *Safian*, 543 S.W.3d at 220; *Ex parte Castillo*, 469 S.W.3d at 169; *Watson*, 306 S.W.3d at 273; *Hall*, 225 S.W.3d at 525, 535–36). An offense is a lesser-included offense of another "if the indictment for the greater-inclusive offense either: 1) alleges all of the elements of the lesser-included offense, or 2) alleges elements plus facts (including descriptive

10

averments . . . ) from which all of the elements of the lesser-included offense may be deduced." *Id.* (citing *Watson*, 306 S.W.3d at 273); *see also Ex parte Denton*, 399 S.W.3d at 546 (in comparing the offenses, an appellate court "focus[es] on the elements alleged in the charging instrument").

When comparing the statutory elements of two offenses, we must determine whether each statutory offense "requires proof of a fact which the other does not." *See Ex Parte Castillo*, 469 S.W.3d at 168 (citing *United States v. Dixon*, 509 U.S. 688, 697 (1993); *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "[L]esser-included offenses are legally the same as a greater offense, and are wholly subsumed by the elements of the greater offense, unless the potential lesser-included offense requires proof of a fact not required to establish the greater offense." *Id.* (citing *Harris v. Oklahoma*, 433 U.S. 682 (1977) (per curiam); *Brown v. Ohio*, 432 U.S. 161, 168 (1977); Tex. Code Crim. Proc. art. 37.09(1)).

The protections against double jeopardy are fundamental in nature; therefore, an appellant may generally raise the issue for the first time on appeal without regard to preservation of error. *See Gonzalez v. State*, 8 S.W.3d 640, 643–644 (Tex. Crim. App. 2000) (en banc). However, a double jeopardy violation may be raised for the first time on appeal "when the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests." *Id.* at 643. Here, the criteria are met.

## B. Comparing the charged offenses

As a preliminary matter, we note that Appellant was indicted on two separate aggravated assault offenses—the first for aggravated assault by threatening Fisher in retaliation for his service as a witness (08-23-00277-CR), and the second for aggravated assault by causing Fisher bodily injury in retaliation for his service as a witness (08-23-00278-CR). Although Appellant appears to

contend that retaliation was a lesser-included offense of both aggravated assault offenses, we need only find that it was a lesser-included offense of one of the assault offenses to find a double jeopardy violation. Accordingly, our analysis will focus solely on whether the retaliation offense is considered a lesser-included offense of the aggravated-assault-by-threat offense.

### (1) Aggravated assault by threat

The statutory elements of the offense of aggravated assault by threat are set out in §§ 22.01 and 22.02 of the Texas Penal Code. Section 22.01 provides that a person commits the offense of assault if "the person . . . intentionally, knowingly, or recklessly causes bodily injury to another . . . [or] intentionally or knowingly threatens another with imminent bodily injury . . . " Tex. Pen. Code Ann. § 22.01. Section 22.02(a) provides that the offense becomes an aggravated assault "if the person commits assault [and] uses or exhibits a deadly weapon during the commission of the assault." Tex. Pen. Code Ann. § 22.02(a)(2). Section 22.02(b) provides that an aggravated assault is a felony of the first degree if it is "in retaliation against or on account of the service of another as a witness, prospective witness, informant, or person who has reported the occurrence of a crime."[8] Tex. Pen. Code Ann. § 22.02 (b)(2). As set forth above, the assault-by-threat indictment alleged Appellant committed first-degree aggravated assault by "intentionally or knowingly threaten[ing] Jeff Fisher with imminent bodily injury by pointing a firearm at him, and used or exhibited a deadly weapon, namely a firearm, during the commission of the assault, and the defendant was acting in retaliation against or on account of the service by Jeff Fisher as a witness."

### (2) Retaliation

The elements of retaliation are set forth in § 36.06 of the Texas Penal Code, which provides:

---

[8] We note that although this Code provision was amended effective September 1, 2023, the amendments did not alter the relevant portions of the statute that we apply to Appellant's case.

"A person commits [the offense of retaliation] if the person intentionally or knowingly harms or threatens to harm another by an unlawful act: (1) in retaliation for or on account of the service or status of another as a (A) public servant, witness, prospective witness, or informant; or (B) person who has reported or who the actor knows intends to report the occurrence of a crime." Tex. Pen. Code Ann. § 36.06(a)(1)(A)(B). The indictment for the retaliation offense alleged Appellant "intentionally or knowingly threaten[ed] to harm another, namely Jeff Fisher, by an unlawful act, namely threaten to kill him, in retaliation for or on account of the service of Jeff Fisher as a witness."

### (3) Under the pleadings, retaliation was a lesser-included offense of aggravated assault by threat.

In comparing these two offenses as alleged in the respective indictments, we conclude that the offense of retaliation is legally the same as the offense of aggravated assault by threat—that is, the offense of retaliation is wholly subsumed by the elements of the aggravated-assault-by-threat offense. The indictment for retaliation required the State to establish that Appellant intentionally or knowingly threatened to harm Fisher, and more specifically, that he threatened to kill Fisher in retaliation for his service as a witness. In turn, the indictment for aggravated assault by threat alleged that Appellant made an intentional or knowing threat to commit imminent bodily injury in retaliation for Fisher's service as a witness. As Appellant points out, while the language in the two indictments varied in describing the nature of the threats, the Court of Criminal Appeals has held that threats to "harm" and threats to commit "bodily injury" are the same for purpose of conducting a lesser-included-offense analysis. *See Schmidt v. State*, 278 S.W.3d 353, 359 (Tex. Crim. App. 2009) (finding that assault by threatening to cause bodily injury to another was a lesser-included offense of retaliation by threat to cause harm to another by striking the person in retaliation for his

13

service as a witness). While the aggravated-assault offense required proof of one additional fact beyond the retaliation offense—that Appellant used a deadly weapon in the commission of the offense—the facts to establish the retaliation offense were completely subsumed within the facts to establish the aggravated-assault offense. We therefore conclude that retaliation was a lesser-included offense of the aggravated-assault-by-threat offense, as alleged in the indictments.[9]

In addition, the face of the record establishes that the State was relying on the same conduct to punish Appellant for both offenses. While Appellant made the same repeated threat to "blow off" Fisher's head, he made only one statement from which the jury could have inferred that his threats were in retaliation for Fisher's service as a witness. Specifically, Appellant told Fisher he would release him if Fisher told the judge he had lied about Appellant's threats to burn down the courthouse.

The State, however, argues the indictments against Appellant alleged alternative "manner and means" by which Appellant assaulted Fisher, and the jury therefore could have found him guilty of both aggravated-assault offenses, as well as the retaliation offense, based on Appellant's alleged commission of factually distinct acts. In support of its argument, the State relies upon our sister court's holding in *Sonnenberg v. State*, No. 03-14-00530-CR, 2016 WL 3475200, at *2–3 (Tex. App.—Austin June 16, 2016, no pet.) (mem. op., not designated for publication). But we

---

[9] The State contends we should consider whether the legislature intended for a defendant to receive multiple punishments for these two offenses. But when, as here, the State has charged a defendant with both a greater and lesser-included offense, a presumption applies that they constitute the same offense for double-jeopardy purposes. *Littrell v. State*, 271 S.W.3d 273, 278 (Tex. Crim. App. 2008). Unless the legislature has clearly expressed an intention that an accused should be punished for both offenses, the presumption is not overcome. *Id.* Here, the State has pointed to no such clearly expressed legislative intent, nor are we aware of any. *Id.* (recognizing that "[t]he Legislature knows well enough how to plainly express its intention that an accused should suffer multiple punishments for the same offense").

find that case inapposite to the present situation. In *Sonnenberg*, the defendant assaulted his girlfriend in several different ways during a single encounter. *Id*. at *2. He was charged with one count of "assault strangulation enhanced" based on committing the offense by several alternative means, including applying pressure to her neck with his hands, and a separate count of aggravated assault based on the allegation that he assaulted her using a deadly weapon (his hands or feet) and caused her bodily injury by either applying pressure her to her neck with either his hands or his feet, or by striking her with his foot. *Id*. at *3. As here, the defendant in *Sonnenberg* did not raise a double jeopardy claim in the trial court, but on appeal from his conviction for both offenses, he argued that double jeopardy was apparent on the face of the record, as the jury could have found him guilty of both offenses based on committing the same act, i.e., applying pressure to his girlfriend's neck.[10] *Id*. at *3. The Austin court disagreed, finding that the evidence established that the defendant committed at least two factually distinct acts, which included kicking his victim multiple times, in addition to strangling or applying pressure to her neck with his hands. *Id.* at *3. Because the jury could have convicted the defendant of the offenses charged in the indictment based on the commission of these two factually distinct acts, the court held there was no double jeopardy violation "apparent on the face of the record." *Id*. at *3 (citing *Langs v. State*, 183 S.W.3d 680, 687 (Tex. Crim. App. 2006)).

Here, as in *Sonnenberg*, the record reflects that Appellant committed two factually distinct assaults on Fisher, by threatening him with a gun and by causing him bodily injury by striking him with an axe handle. But the record does not reflect that he committed two factually distinct acts to

---

[10] The defendant also failed to object to the jury charge, which failed to apprise the jury that it could not rely on the same act to convict him of the two separate counts. *Sonnenberg v. State*, No. 03-14-00530-CR, 2016 WL 3475200, at *3 (Tex. App.–Austin June 16, 2016, no pet.) (mem. op., not designated for publication).

support his conviction for both the aggravated-assault-by-threat offense and the retaliation offense. To the contrary, the record reflects that the State relied on the same threats to harm Fisher in retaliation for his service as a witness in charging him with both the assault and the retaliation offenses.

Indeed, the State even agreed during a charge conference that there was no need to provide the jury with an instruction on the retaliation element of the aggravated-assault offenses because this enhancement element of the aggravated assault offense was the "same" as the "retaliation claim." The State effectively conceded that the retaliation claim was subsumed within the assault offenses by agreeing to "rely on the jury's finding beyond a reasonable doubt as to retaliation under [the retaliation charge] then apply that [finding] to the aggravated assault charges for enhancement purposes." Even on appeal, the State defended the structure of the jury charge, again arguing that the enhancement element of the aggravated-assault offenses was the "same" as the elements of the retaliation offense.[11]

In sum, the State relied on the same factual allegations and evidence to impose multiple punishments on Appellant for both the greater offense of aggravated assault by threat and the lesser-included offense of retaliation in violation of double jeopardy. *See Evans v. State*, 299 S.W.3d 138, 143 (Tex. Crim. App. 2009) (holding that indecency with a child is a lesser-included offense of aggravated sexual assault of a child when both offenses are predicated on the same act

---

[11] The State can be judicially estopped from now contending that the two offenses were based on factually-distinct acts. *Schmidt v. State*, 278 S.W.3d 353, 358 (Tex. Crim. App. 2009) (finding that the State was judicially estopped from contending that an indictment alleged a different act, where it contended otherwise in a prior proceeding in the same case) (citing *New Hampshire v. Maine,* 532 U.S. 742, 749–51 (2001) (equitable rule of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase")); *see also Ruffins v. State*, 666 S.W.3d 636, 643 (Tex. Crim. App. 2023) (explaining that a defendant may be estopped from contending that there was error in a jury charge on appeal, as doing so would be "inconsistent" with his position at trial). Regardless, the State's new argument would not prevail.

and defendant therefore could not be convicted of both offenses); *Elder v. State*, 132 S.W.3d 20, 24 (Tex. App.—Fort Worth 2004, pet. ref'd) (double jeopardy violation occurred where the State charged defendant with the lesser-included offense of indecency by contact and the greater offense of aggravated sexual assault, and "used the same acts by appellant to prove both offenses"); *see also Teeter v. State*, No. PD-1169-09, 2010 WL 3702360, at *6 (Tex. Crim. App. Sept. 22, 2010) (not reported in S.W.3d) ("in a multiple-punishments context, the fact that aggravated assault as alleged . . . is a lesser-included offense of attempted capital murder as alleged . . . establishes that the 'facts required' are the same for the two offenses, and appellant is entitled to relief from a double-jeopardy violation").

The remedy for a double jeopardy violation in the multiple-punishments context is to set aside the conviction for the lesser offense—which typically carries the lesser sentence—and retain the conviction and sentence for the greater offense. *See Littrell v. State*, 271 S.W.3d 273, 279 (Tex. Crim. App. 2008) (because the aggravated-robbery conviction, which was the lesser-included offense of felony murder, carried the lesser sentence, the remedy was to set aside the aggravated-robbery conviction while retaining the conviction and sentence for the felony-murder offense); *see also Rios-Barahona v. State*, No. 13-17-00567-CR, 2019 WL 3952949, at *5 (Tex. App.—Corpus Christi–Edinburg Aug. 22, 2019, pet. ref'd) (mem. op., not designated for publication) (recognizing that "[t]he remedy for a double jeopardy violation in the multiple-punishments context is to retain the conviction and sentence for the most serious offense, while setting aside the conviction and sentence for the lesser offense").

Here, the record reflects that the trial court sentenced Appellant to a 20-year prison term for the aggravated-assault-by-threat offense and to a ten-year sentence for the lesser offense of retaliation. Therefore, the proper remedy is to set aside the conviction for the retaliation offense,

while retaining the conviction and sentence for the aggravated-assault-by-threat offense.

Appellant's sole issue on appeal is sustained.

## III.  CONCLUSION

Having concluded that convicting Appellant for both the aggravated-assault-by-threat offense and the retaliation offense in this case is barred by double jeopardy, we reverse the trial court's judgment and set aside the conviction and sentence for the retaliation offense.


LISA J. SOTO, Justice


August 29, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)